**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **BRYCE PAUL SABIN,** | ) | |
| | ) | |
| | ) | |
| **Plaintiff/Counter-** | ) | |
| **Defendant,** | | |
| | ) | **No. 04 C 193** |
| **v.** | ) | |
| **YELLOW TRANSPORTATION, INC.,** | ) | **JUDGE DAVID H. COAR** |
| | ) | |
| | ) | |
| **Defendant/Counter-** | ) | |
| **Plaintiff.** | | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Plaintiff Bryce Paul Sabin ("Plaintiff") is suing his former employer, Defendant Yellow

Transportation, Inc. ("Defendant" or "Yellow"), for retaliatory discharge. Defendant is counter-

suing Plaintiff for breach of duty of loyalty, breach of contract, conversion, unjust enrichment,

and promissory estoppel. Before this Court is Defendant's motion for summary judgment in its

favor on Plaintiff's retaliatory discharge claim and on its breach of duty of loyalty and breach of

contract counterclaims. For the following reasons, Defendant's motion is DENIED on all three

counts.

**I.     LEGAL STANDARD**

Summary judgment is appropriate if "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." Fed. R. Civ. P. 56(c).   A genuine issue of material fact exists only if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  When reviewing a motion for summary judgment, the court must view the facts in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor.  See Schuster v. Lucent Technologies, Inc., 327 F.3d 569, 573 (7th Cir. 2003).

The movant bears the burden of establishing that no genuine issue of material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the movant meets this burden, the non-movant must set forth specific facts demonstrating that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); Celotex, 477 U.S. at 324.  To successfully oppose the motion, the non-movant must designate these facts in affidavits, depositions, answers to interrogatories, or admissions; the non-movant cannot rest on the pleadings alone.  Celotex, 477 U.S. at 324.  "A scintilla of evidence in support of the non-movant's position is insufficient," Anderson, 477 U.S. at 252, and the non-movant "must do more than simply show that there is some metaphysical doubt as to the material fact."  Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Weighing evidence, determining credibility, and drawing reasonable inferences are jury functions, not those of a judge deciding a motion for summary judgment. Anderson, 477 U.S. at 255.

## II.    FACTS[1]

<u>Plaintiff's Termination</u>

Defendant is a national trucking company that employed Plaintiff as a "casual" city driver at various terminals in Chicago from 1995 until 1997, and as a "regular" city driver at its Chicago Ridge Terminal from 1997 until 2001.

On February 12, 2001, Defendant terminated Plaintiff for alleged insubordination. Plaintiff filed a grievance challenging the termination through his union, Teamsters Local 705 ("Union"), under the collective bargaining agreement ("CBA") that governed the terms and conditions of his employment.  A joint management-labor committee ("Committee") reinstated Plaintiff without back pay or, benefits effective April 1, 2001.

Plaintiff also filed a complaint, on March 27, 2001, with the U.S. Department of Labor, Occupational Health and Safety Administration ("OSHA") under the Surface Transportation Assistance Act ("STAA"), 49 U.S.C. § 31105 ("the 2001 STAA Claim").  Plaintiff alleged that Defendant terminated him because he had engaged in protected activity (namely, reporting a fault with his truck).  On April 16, 2001, after an investigation, the U.S. Secretary of Labor ("the Secretary") dismissed Plaintiff's claim on the grounds that the allegations lacked merit.

<u>Plaintiff's Subsequent Termination</u>

Meanwhile, in accordance with the Committee's decision, Defendant prepared for Plaintiff to return to work on Monday, April 2, 2001.  Defendant scheduled Plaintiff to work Monday, Tuesday, and Wednesday of that week.  On each of those three days, however, Plaintiff

---

[1] The facts are taken from the parties' Local Rule 56.1 materials.

called to inform Yellow dispatcher Michael Flanagan ("Flanagan") that he would not report to work. In accordance with the CBA, Plaintiff received paid time-off, with benefits, during this three-day period. Plaintiff then returned to work at Yellow on Thursday, April 5, 2001. He also worked at Yellow on April 6 and 9, 2001.

A few months later, in June 2001, Plaintiff called the Illinois State Police to inspect a Yellow truck that he was driving. This was one of Plaintiff's many public complaints about the safety hazards created by Defendant's operations. One dispute between the parties, for example, is whether Plaintiff received a "warning letter" from Defendant's Regional Linehaul Manager for calling the police about safety issues.

Later in the summer of 2001, Defendant learned for the first time that Plaintiff had worked for another trucking company, VSA of Illinois ("VSA"), from the last week of March 2001—shortly before he was scheduled to return to work at Yellow—until August 20, 2001. Shortly thereafter, Defendant learned that Plaintiff was driving a truck for VSA on April 2, 3, and 4, 2001—the same days he called off work from Yellow. Defendant also learned that, during the week of April 2, 2001, Plaintiff had driven in excess of sixty hours in a seven-day rolling period, exceeding the maximum hours of service a truck driver can perform under the U.S. Department of Transportation ("DOT") regulations. Plaintiff's driving time for VSA combined with his driving time for Defendant during the week of April 2, 2001 resulted in Plaintiff's violation of DOT regulations.

On September 13, 2001, upon request, Flanagan completed a written statement recalling that Plaintiff called in sick on April 2, 3, and 4, 2001. Immediately thereafter, Defendant sent Plaintiff three different termination letters. The letter dated September 13, 2001 stated that

Plaintiff was terminated for proven dishonesty because he called in sick April 2-4 and accepted sick pay for those days when he instead drove a truck for VSA. The letter dated September 27, 2001 stated that Plaintiff was terminated for proven dishonesty because he reported to work at Yellow on April 6 and 9 after having been on duty for too many hours (including Plaintiff's hours with VSA) the previous seven days in violation of DOT regulations. The letter dated September 28, 2001 stated that Plaintiff was terminated for proven dishonesty because he failed to report to work on August 20, 2001 (an unexplained, unexcused absence) and instead drove a truck for VSA that day. Under the CBA, "proven dishonesty" is a "cardinal infraction" that allows for immediate termination. See Def.'s L.R. 56.1 Statement, Tab M at 72.

Also under the CBA, an employee's four sick or personal days per year are not treated differently. An employee's sick or personal day does not cost Defendant any more money than an employee's actual workday. Furthermore, employees do not have to tell Yellow why they are using their personal days (Plaintiff did not), and Yellow did not inform drivers that there were restrictions on their activities during personal or sick days. Likewise, there is nothing in Defendant's policy or in the employment contract that prohibits an employee from moonlighting.[2] Finally, Plaintiff emphasizes that Yellow drivers were not and are not required to report hours worked outside of Yellow. In fact, Yellow's Director of Labor Relations is not

---

[2] In addition, Plaintiff emphasizes that two particular drivers without, he claims, a history of whistleblowing activity (Israel Gonzales and Brian Fiener) were issued only warning letters, not terminations, for exceeding DOT hours. Defendant points out that the men exceeded the maximum hours all while working for Yellow. The parties dispute whether Defendant treats violations of DOT maximum hours of service differently when an employee violates those regulations while working exclusively for Yellow as opposed to while working for other companies. Plaintiff also contends that the men did not report the hours they drove for other companies during the period after their termination but before their reinstatement.

aware of any drivers prior to Plaintiff's termination who actually reported moonlighting hours to Yellow.

Plaintiff Challenges the Termination Decision

After his September 2001 termination, Plaintiff filed a Union grievance alleging that Defendant terminated him because he engaged in protected activity. The Committee heard his grievance and upheld the termination on October 12, 2001.

Plaintiff also filed a complaint with OSHA under the STAA in March 2002 ("the 2002 STAA Claim"). As before, the Secretary investigated and dismissed the claim, finding that Defendant terminated Plaintiff on September 13, 2001 for dishonesty, not for protected whistleblower activity. Plaintiff appealed the decision to an Administrative Law Judge ("ALJ").

During discovery in the STAA Appeal, Defendant learned that Plaintiff had taken copies of other drivers' daily logs from Defendant's premises without permission   There are two copies of each log: Defendant retains a white copy and the individual driver retains a yellow copy. Plaintiff took yellow drivers' copies only, and submitted them to the DOT in an attempt to substantiate a complaint about Yellow. Plaintiff returned some of the logs he took the next day, but threw away others that were at least seven days old.

The Settlement Conference

The parties voluntarily attended a settlement conference presided over by ALJ Jansen on May 22, 2003. Defendant's counsel, Anderson Scott ("Scott") and Matt Brazeal ("Brazeal"), attended, as did Plaintiff and his attorney, Paul Taylor ("Taylor").

At the beginning the conference, the parties signed an agreement stating, in relevant part: "No party shall be bound by anything said or done during settlement judge proceedings unless a settlement is reached. If a settlement is reached, the agreement shall be written and executed and shall be binding upon all parties to the agreement subject to approval by the presiding judge." Pl.'s L.R. 56.1 Compendium, Tab No. 1.

Scott brought with him a copy of a proposed settlement agreement that he had drafted. The proposed agreement left blank the monetary amount of any possible settlement. Taylor reviewed the proposed agreement and requested minor changes–to which Scott agreed—to the agreement's confidentiality language.[3]

The parties discussed possible settlement figures ranging from $9,000 to $53,000. Plaintiff testified that, at the end of the conference, he had no idea where the parties were in terms of a dollar amount, and the parties reached no agreement. Defendant, by contrast, maintains that Plaintiff and his attorney agreed to release, waive, and settle all actual and potential claims against Defendant for $9,000, including attorneys' fees, and that Scott was to prepare a revised writing that reflected the agreement. The parties agree that Plaintiff never signed a written document agreeing to dismiss or settle his claims against Defendant. In any event, on June 2, 2003, ALJ Jansen issued a written notice stating that "the parties have announced that settlement has been reached." Def.'s L.R. 56.1 Statement, ¶ 39.

---

[3] The parties dispute the manner in which Taylor reviewed the proposed agreement with Plaintiff and whether Plaintiff understood and agreed to the terms of the agreement.

<u>Events After the Settlement Conference</u>

The same day ALJ Jansen issued the above notice (June 2, 2003), Scott sent Taylor a revised settlement agreement that included the amount of Defendant's gross payment to settle Plaintiff's claims ($9,000) but left blank the allocation of that payment between Taylor's attorneys' fees and Plaintiff's damages. Taylor sent this revised settlement agreement to Plaintiff.

Several weeks passed. Finally, the judge assigned to adjudicate the STAA Appeal, ALJ Tierney, announced that he would schedule a hearing on the merits unless he received the settlement document. Taylor then wrote a letter to ALJ Tierney on July 17, 2003 stating that the parties had reached a settlement, but (1) his client (Plaintiff) had informed him that he (Plaintiff) did not wish to follow through on the settlement and (2) Taylor intended to withdraw as Plaintiff's counsel. Plaintiff never objected to the contents of the letter, and Taylor withdrew as his counsel on July 22, 2003.

The next month, Brazeal sent Plaintiff a settlement agreement and a check for $9,000. After reading the agreement, Plaintiff returned the check and the agreement, unsigned, to Brazeal. Plaintiff testified that he subsequently was given yet another settlement agreement much shorter in length. This document stated: "Endorsing the attached $9,000.00 check constitutes acceptance of the terms of this Settlement Agreement." Pl.'s L.R. 56.1 Compendium, Tab No. 23. The three documents that Plaintiff considers proposed settlement agreements (the two documents that arrived in the mail plus the proposed agreement Scott brought to the settlement conference) all contained the following language: "The Settlement Agreement contains the entire understanding between the Parties and may not be modified, except in writing

signed by all Parties to this Settlement Agreement."  Pl.'s L.R. 56.1 Compendium, Tab Nos. 21, 22, 23.

In July 2003, Defendant moved for summary judgment in the STAA proceeding.  ALJ Tierney denied the motion, finding that several issues of material fact were in dispute, including but not limited to why Plaintiff was terminated, whether Yellow was engaged in selective enforcement of DOT rules, the type of leave Plaintiff used when he did not report to work on April 2, the amount and types of disciplinary action at Yellow, and the nature of Yellow's policy on working for other companies.

The ALJ's Dismissal of Plaintiff's 2002 STAA Claim

Having denied summary judgment and having received no settlement document, ALJ Tierney held a formal hearing on the STAA Appeal on October 7, 2003.  Plaintiff appeared pro se, and requested a continuance because he expected to file a state court action against Defendant.  Plaintiff explained that he could afford counsel and be heard by a jury of his peers in state court.  ALJ Tierney denied Plaintiff's request for a continuance as untimely.

Plaintiff then moved to withdraw his objections to the Secretary's October 2002 findings that there was no reasonable cause to believe Defendant violated the STAA.  Counsel for Defendant agreed to Plaintiff's withdrawal provided that the ALJ dismiss Plaintiff's claim with prejudice.  Accordingly, ALJ Tierney informed Plaintiff that he would be unable to re-file his claim.  After Plaintiff acknowledged this fact, ALJ Tierney granted Plaintiff's request to withdraw his objections to the Secretary's findings and dismissed the case with prejudice.  ALJ Tierney issued a "Final Decision and Order Approving Complainant's Withdrawal of Objections

to the Secretary's Findings, Reinstating and Affirming the Secretary's Findings, Dismissing

Claim With Prejudice, and Awarding Respondent's Costs" on November 14, 2003.

On October 9, 2003, Plaintiff filed a state court action making the same allegations

contained in his 2002 STAA Claim (that is, Defendant discharged him in retaliation for his

complaints of alleged safety violations).  Defendants removed the case to federal court on

January 12, 2004.

III.    DISCUSSION

    A.    **Plaintiff's Retaliatory Discharge Claim**

        1.    **Res Judicata**

Defendant moves for summary judgment on Plaintiff's retaliatory discharge claim on the

grounds that the claim is barred by the doctrine of res judicata.

Under Illinois law, res judicata bars litigants from refiling an action previously

adjudicated on the merits when the action is directed against the same parties and involves the

same claims.  See <u>DeLuna v. Treister</u>, 708 N.E.2d 340, 344 (Ill. 1999).   Res judicata will bar a

subsequent action if: (1) a court of competent jurisdiction has entered a final judgment on the

merits in the first action; (2) there is an identity of cause of action; and (3) there is an identity of

parties or their privies.  <u>See id.</u>  In Illinois, an order dismissing a suit with prejudice is considered

a final judgment on the merits for purposes of applying res judicata.  See <u>Knodle v. Jeffrey</u>, 545

N.E.2d 1017, 1022 (Ill. App. Ct. 1989).  In addition, "[r]es judicata and collateral estoppel apply

to administrative decisions that are adjudicatory, judicial, or quasi-judicial in nature."  <u>Powers v.</u>

<u>Arachnid, Inc.</u>, 617 N.E.2d 864, 867 (Ill. App. Ct. 1993).  Administrative decisions have

preclusive effect, however, "only in the limited area of factfinding." Wenig v. Lockheed Environmental Systems, 726 N.E.2d 645, 649 (Ill. App. Ct. 2000) (quoting Allahar v. Zahora, 59 F.3d 693, 696 (7th Cir. 1995)).

The parties do not dispute that two of the three requirements for the application of res judicata (identical cause of action, identical parties) have been met. They dispute only whether an administrative agency engaged in factfinding and issued a final judgment on the merits.

Plaintiff argues that the ALJ did not conduct a hearing on the merits of his 2002 STAA Claim or make factual findings at the October 7, 2003 hearing; the ALJ merely denied his request for a continuance, granted his motion to withdraw his objections, and dismissed the STAA claim with prejudice. In fact, Plaintiff argues, ALJ Tierney made "findings" only once, at the summary judgment stage, when he found that multiple factual issues were in dispute.

Defendant argues that ALJ Tierney did issue findings of fact. Indeed, the ALJ issued a "Final Decision and Order Approving Complainant's Withdrawal of Objections to the Secretary's Findings, *Reinstating and Affirming the Secretary's Findings*, Dismissing Claim With Prejudice, and Awarding Respondent's Costs" ("Final Decision and Order") (emphases added). As indicated by its caption, the Final Decision and Order expressly reinstates and affirms the Secretary's findings that Plaintiff's complaint lacked merit. Moreover, it explains that STAA regulations *required* ALJ Tierney to reinstate and affirm the Secretary's findings:

> Section 1978.111(c) of 29 C.F.R., [sic] permits a party to withdraw objections to the Secretary's preliminary findings or preliminary order at any time before the findings or order become final. When such withdrawal occurs before the ALJ or the Secretary, it is required that an order be issued affirming "any portion of the findings or preliminary order with respect to which the objection was withdrawn." 29 C.F.R. § 1978.111(c). If the case is before the ALJ, the ALJ's order becomes the final administrative order in the case.

See Final Decision and Order, Def.'s L.R. 56.1 Statement, Ex. G at 2.  See also 29 C.F.R. § 1978.111(c) (stating that "[t]he judge . . . *shall* affirm any portion of the findings . . . to which the objection was withdrawn") (emphasis added); id. (ALJ Tierney citing the regulation then stating, "[c]onsequentially, I reinstate and affirm the Secretary's preliminary findings").

There is no evidence, however, that the findings ALJ Tierney reinstated and affirmed were the product of the kind of factfinding that should bar Plaintiff's claim in this Court. Specifically, viewing the facts in the light most favorable to Plaintiff, there is no evidence that the Secretary found facts after a hearing in which both parties were present and had the opportunity to be heard.  To the contrary, the evidence indicates that upon receiving Plaintiff's 2002 STAA Claim, the Secretary merely conducted an investigation, without input by Plaintiff, and issued findings.  See Secretary's Findings, Def.'s L.R. 56.1 Statement, Ex. L at 1 (stating that "[f]ollowing an investigation of this matter by a duly authorized investigator, the Secretary of Labor . . . makes the following findings.").  The Secretary's findings as to Plaintiff's 2001 STAA Claim shed additional light on the factfinding that has taken place thus far.  The Final Investigative Report issued on April 16, 2001 states that "Respondent [Yellow] was not contacted regarding the complaint as it was determined that the complaint was not activity protected by the STAA."  See Final Investigative Report Memorandum, Def.'s L.R. 56.1 Statement, Ex. D at 2.  This statement indicates that, in deciding at least one of Plaintiff's claims, the Secretary did not even grant *Defendant* the opportunity to provide facts for the Secretary's consideration.

Further, the STAA provides for hearings before the Secretary issues a final order, but the facts do not indicate to the Court whether such a hearing was held.[4]  As nature of the "factfinding" below is unclear, this Court declines to hold, as a matter of law, that the findings the ALJ adopted act to preclude Plaintiff's claim in the federal court.

The cases cited by the parties support this conclusion.  In Wenig, an employer appealed when the Department of Labor ("DOL") determined that the plaintiff's retaliatory discharge claim was well-founded.  While the appeal was pending before the ALJ, the plaintiff indicated his desire to pursue his claim solely in state court, refused to sit for a deposition, and failed to respond to an order to show cause.  Accordingly, the ALJ dismissed the DOL proceeding with prejudice "to prevent [the] plaintiff from reinstating his [DOL] proceeding if the state circuit court case did not proceed to his satisfaction."   Wenig, 726 N.E.2d at 649.  The employer then raised a res judicata defense in the subsequent state action.  The Appellate Court of Illinois held that "the ALJ issued scheduling orders and considered the parties' arguments as to plaintiff's efforts to voluntarily dismiss the Department proceeding . . . . [but] conducted no hearing on the

_____

[4]  Under the STAA, after receiving a complaint, the Secretary must "conduct an investigation, decide whether it is reasonable to believe the complaint has merit, and notify the complainant and the person alleged to have committed the violation of the findings."  49 U.S.C. § 31105(b)(2)(A).  If the Secretary decides it is reasonable to believe a violation occurred, the Secretary includes "findings" and a "preliminary order for relief" in the notice.  See id.  After receiving notice of the Secretary's decision, the complainant (here, Plaintiff) and the respondent (here, Yellow) have thirty days to file objections and request a hearing on the record.  If no hearing is requested, the preliminary order is "final and not subject to review."  49 U.S.C. § 31105(b)(2)(B).  If a hearing is requested, the Secretary is to issue a final order no more than 120 days after the hearing.  49 U.S.C. § 31105(b)(2)(C).  A party dissatisfied with the order may file a petition for review in a United States court of appeals.  49 U.S.C. § 31105(c).  It is not clear to this Court that the procedure just described is the procedure that was followed in Plaintiff's case.  Nonetheless, the Secretary's Findings cite to these statutory provisions for its authority to investigate and decide Plaintiff's claim.  See Secretary's Findings, Def.'s L.R. 56.1 Statement, Ex. L, ¶ 3.

merits of the case and resolved no disputed issues of fact." Id. at 650. Res judicata, therefore, did not bar the plaintiff's state action.

In Allahar v. Zahora, 59 F.3d 693 (7th Cir. 1995), a couple filed a claim with the Illinois Department of Human Rights ("IDHR") but later decided to pursue the claim solely in federal court. The couple never, however, completed the paperwork for a voluntary withdrawal, so the IDHR dismissed their complaint. The defendant then asserted the doctrine of res judicata in federal court. The Seventh Circuit held that res judicata did not bar the couple's claim since "[t]he IDHR's dismissal was a self-defined action of administrative closure—a dismissal prompted by the Allahars' stated intent to withdraw the claim" and a dismissal that "occurr[ed] before any factfinding or consideration of the [merits of the] case by the IDHR." Allahar, 59 F.3d 693 at 696.

In Lileikis v. SBC Ameritech, Inc., No. 01 C 9554, 2003 WL 21077864 (N.D. Ill. Mar. 13, 2003), the plaintiff knew that her attorney was going to be out of town on the hearing date, so she requested a continuance before and at the hearing. The court denied the plaintiff's request both times, but the plaintiff refused to proceed without her attorney present. The IDHR then dismissed her claim for lack of participation. The plaintiff's appeals were unsuccessful, and she ultimately decided to abandon the IDHR action in favor of pursuing her claim in federal court. This Court held that res judicata did not bar her federal claim since no court or administrative body had made any determination on the underlying merits of her discrimination complaint. See Lileikis, 2003 WL 21077864 at *6.

As in Wenig, Allahar, and Lileikis, it does not appear that an administrative agent or body conducted a hearing on the merits of Plaintiff's case and resolved disputed issues of fact.

The facts yield only the certainty that the U.S. Secretary of Labor investigated Plaintiff's complaint and issued a final report. The facts yield nothing about the extent of the investigation or the events leading to the report. Because the nature of the findings affirmed by the ALJ (in accordance with STAA regulations) is unclear, those findings are insufficient to preclude Plaintiff from litigating his retaliatory discharge claim in federal district court.

## 2. Retaliatory Discharge

Defendant argues that, even if res judicata does not bar Plaintiff's claim, Plaintiff cannot survive summary judgment because he cannot establish that he was discharged in retaliation for protected activity rather than for legitimate reasons.

To avoid summary judgment in Defendant's favor, Plaintiff must demonstrate a question of fact as to whether (1) he was discharged (2) in retaliation for his activities, and (3) the discharge violated a clear mandate of public policy. See Hartlein v. Illinois Power Co., 601 N.E.2d 720, 728 (Ill. 1992). The second element requires Plaintiff to demonstrate a causal relationship–not a mere "sequential connection"—between his activities and his discharge. See Roger v. Yellow Freight Systems, Inc., 21 F.3d 146, 149 (7th Cir. 1994); Hinthorn v. Roland's of Bloomington, Inc., 519 N.E.2d 909, 912 (Ill. 1988). "The element of causation is not met if the employer has a valid basis, which is not pretextual, for discharging the employee." Hartlein, 601 N.E.2d at 728.

Plaintiff testified that he does not know *which* complaint triggered his discharge, and he has "no idea why Yellow or what Yellow [sic] what triggered them to fire me." Def.'s L.R. 56.1 Statement, Ex. A at 133-34. Thus, Defendant argues, Plaintiff relies only on his self-serving

speculation as to the reasons for his termination to avoid summary judgment.  See Billups v. Methodist Hospital of Chicago, 922 F.2d 1300, 1303 (7th Cir. 1991) (stating that "self-serving remarks standing alone are insufficient to raise doubt as to the credence of the employer's explanation for termination.").

Plaintiff's speculation, however, does not stand alone.  First, Plaintiff has shown that Defendant sent him at least three termination letters stating different grounds for his termination on the basis of "proven dishonesty."  Yellow's general operating manager testified that he does not know of any employees aside from Plaintiff that were terminated three times in one month.  A reasonable jury could believe that the series of termination letters is evidence of pretext or, as Plaintiff argues, evidence of "an effort [by Defendant] to terminate Plaintiff for any proffered reason that the [U]nion would accept."  Pl.'s Resp. at 8.

Second, Defendant states that it terminated Plaintiff for dishonesty when Plaintiff called in sick to drive for VSA in April 2001; failed to report that he exceeded the maximum hours of service while driving for VSA in April 2001; and drove a truck for VSA instead of reporting to work in August 2001.  The facts show, however, that Plaintiff was not told there were restrictions on his activities during his sick or personal days, Yellow's policy and contracts do not prohibit employee moonlighting, and few if any employees reported moonlighting hours to Defendant.  More importantly, there is a dispute of fact as to who (Plaintiff or Defendant) had the obligation to monitor and report Plaintiff's driving hours outside of Yellow, and what drivers were told by Yellow and understood about their personal and sick days.  "When the existence of a uniform policy or practice is in doubt, it cannot serve as a reason for discharging [the plaintiff]."  Sarsha v. Sears, Roebuck & Co., 3 F.3d 1035, 1040 (7th Cir. 1993).  In the very

-16-

least, the policy or practice cannot serve as the basis for summary judgment in the employer's favor.

Finally, Plaintiff has shown that Defendant issued him a "warning letter" for calling the police about equipment safety issues. While Defendant argues that the call does not amount to protected activity, and that the letter does not prove its animosity toward protected activities by employees, the Court must draw all reasonable inferences in the Plaintiff's favor. A reasonable jury could infer that Defendant had an adverse reaction to Plaintiff's activities—a reaction causally related to Plaintiff's termination.

In sum, Plaintiff has offered evidence to create a doubt as to Defendant's reasons for terminating him. Plaintiff does not need *direct* evidence, such as an admission by Defendant, that would link his termination to specific protected activities, as Defendant erroneously argues. See, e.g., Tullis v. Townley Engineering & Manufacturing Co., Inc., 243 F.3d 1058, 1062 (7th Cir. 2001) (applying the McDonnell-Douglas method to retaliatory discharge cases in Illinois); Bourbon v. Kmart Corp., 223 F.3d 469, 473 (7th Cir. 2000) (same). But perhaps Defendant's more troubling argument is that no issue for trial remains because "[Plaintiff] has acknowledged that Yellow's . . . reasons for terminating him are truthful" and "legitimate." Def.'s Mem. in Support of Summ. J. at 9. The parties' factual statements make clear that Plaintiff has made no such acknowledgment. Thus, viewing the facts in the light most favorable to Plaintiff, there is a genuine issue for trial as to whether Plaintiff's discharge was causally related to his whistleblowing activity.

## B. Defendant's Breach of Duty of Loyalty Counterclaim

Defendant also moves for summary judgment on Counterclaim I, which alleges that Plaintiff breached his duty of loyalty to Defendant by working as a driver for VSA, exceeding his maximum hours of service under DOT regulations during the week of April 1, 2001, and failing to inform Defendant that he exceeded those hours. Defendant also alleges that Plaintiff breached his duty of loyalty by taking other drivers' daily logs from Yellow's premises.

In Illinois, employees have a special, fiduciary relationship with their employers. See People v. Myers, 686 N.E.2d 363, 367 (Ill. App. Ct. 1997). An employee owes the duty of fidelity and loyalty and cannot, therefore, "act inconsistently with his agency or trust; i.e., solicit his employer's customers for himself, entice coworkers away from his employer, or appropriate his employer's personal property." ABC Trans National Transport, Inc. v. Aeronautics Forwarders, Inc., 379 N.E.2d 1228, 1237 (Ill. App. Ct.1978). An employee also breaches this duty when he acts unfavorably to the employer's interests or hides facts that involve the employer's interest. See Beaton & Associates, Ltd. v. Joslyn Manufacturing & Supply Co., 512 N.E.2d 1286, 1291 (Ill. App. Ct.1987), superceded by statute on other grounds as stated in Royal Imperial Group, Inc. v. Joseph Blumberg & Associates, Inc., 608 N.E.2d 178, 181-83 (Ill. App. Ct. 1992). To prevail on this counterclaim, Defendant (here, Counter-Plaintiff) must prove that (1) a fiduciary duty exists, (2) the fiduciary duty was breached, and (3) the breach proximately caused the injury of which Defendant complains. See Crichton v. Golden Rule Insurance Co., 832 N.E.2d 843, 854 (Ill. App. Ct. 2005).

It is undisputed that Plaintiff worked for VSA, that he exceeded the maximum driving hours under DOT regulations, and that he removed daily logs from Yellow's premises. There is

a dispute of fact, however, as to whether Plaintiff had a fiduciary duty to inform Defendant of his excess hours of service. Defendant cites a regulation that requires drivers who work for multiple motor carriers in the span of twenty-four hours to submit a record of duty status to each motor carrier. See Def.'s Reply Mem. at 11 (citing 49 C.F.R. 395.8(j)(1)). Plaintiff, by contrast, has produced facts showing that Defendant did not require drivers to report hours worked outside of Yellow. Moreover, the parties dispute whether Defendant ever monitored, or had a duty to monitor, drivers' excess hours.[5] On the facts here, there is sufficient evidence for a reasonable jury to return a verdict for Plaintiff, rather than Defendant, on this issue.

There is also a dispute of fact as to whether Plaintiff's removal of several drivers' daily logs is the equivalent of appropriating Defendant's personal property. Defendant argues that by taking the logs without permission, Plaintiff breached his duty of loyalty. Plaintiff maintains that he removed only that which he believed was the discarded, outdated property of individual drivers, not the property of Yellow. Because Defendant has not countered the distinction drawn by Plaintiff, there is insufficient evidence to grant Defendant judgment as a matter of law on this issue. Defendant is not entitled summary judgment on its breach of the duty of loyalty counterclaim.[6]

_____

[5] In addition, Defendant has not produced sufficient facts to establish the injury about which it complains. Defendant states that Plaintiff's conduct subjected it to liability, but cites only regulations that do not convey clearly to the Court the consequences Defendant suffers when employees such as Plaintiff engage in wrongful conduct. See Def.'s Reply Mem. at 11 (citing 49 C.F.R. §§ 395.3, 395.8(j)(1)).

[6] Defendant further argues that it is entitled to restitution of at least the compensation it paid to Plaintiff during the period of his breach, regardless of whether Plaintiff's conduct caused injury to Defendant. See Vendo Co. v. Stoner, 321 N.E.2d. 1, 14 (Ill. 1974), cert. denied, 420 U.S. 975 (1975); see also Wabash, Inc. v. Avnet, Inc., 516 F. Supp. 995, 1000 (C.D. Ill. 1981). Since this Court finds that there is a question as to whether Plaintiff committed a breach, this

## C.    Defendant's Breach of Contract Counterclaim

Lastly, Defendant moves for summary judgment on Counterclaim II, breach of contract. Defendant argues that, at the May 22, 2003 settlement conference, the parties entered into an enforceable oral contract to settle Plaintiff's claim for $9,000.  Plaintiff, by contrast, argues that the parties did not intend to be bound until a formal agreement was executed and delivered after the settlement conference.

Local contract law governs the formation, construction, and enforcement of settlement agreements.  See Pohl v. United Airlines, Inc., 213 F.3d 336, 338 (7th Cir. 2000).  In Illinois,

> . . . a binding agreement requires a meeting of the minds or mutual assent as to all material terms. Whether the parties had a "meeting of the minds" is determined not by their actual subjective intent, but by what they expressed to each other in their writings.  Thus, the parties decide for themselves whether the results of preliminary negotiations bind them, and they do so through their words.

Abbott Laboratories v. Alpha Therapeutic Corp., 164 F.3d 385, 387 (7th Cir. 1999). Furthermore, "[t]he fact that a formal written document is anticipated does not preclude enforcement of a specific preliminary promise."  Dawson v. General Motors Corp., 977 F.2d 369, 374 (7th Cir. 1992).  A contract can be formed before there is an official document memorializing the deal.  See Chicago Investment Corp. v. Dolins, 481 N.E.2d 712, 715 (Ill. 1985).  If, for example, "the parties agree that a formal document will be prepared only as a memorialization of the oral agreement, the bargain is binding even though the document has not been executed."  Ceres Illinois, Inc. v. Illinois Scrap Processing, Inc., 500 N.E.2d 1, 5 (Ill. 1986).

---

Court need not reach the question of restitution.

However, "even where the essential terms have been agreed upon, 'if the clear intent of the parties is that neither will be legally bound until the execution and delivery of a formal agreement, then no contract comes into existence until such execution and delivery.'" Id. (quoting Chicago Title & Trust Co. v. Ceco Corp., 415 N.E.2d 668, 677 (Ill App. Ct. 1980)).

Plaintiff has sufficiently demonstrated that a question of fact exists as to whether Plaintiff and Defendant intended to execute a writing as a "memorialization" or whether they did not intend to be bound until a formal agreement was executed and delivered. First and most fundamentally, however, the parties dispute whether there was mutual assent as to a material term of the agreement. According to Defendant, the parties agreed to a settlement figure of $9,000 in exchange for Plaintiff's release of all claims. Similarly, Plaintiff's former attorney, Taylor, testified that at the close of the settlement conference, he believed the parties' actions demonstrated an intent to be bound by the agreement reached at the conference. Taylor also testified that no one, including Plaintiff, spoke words that would contradict their actions indicating that the settlement was a "done deal." Def.'s L.R. 56.1 Statement, Ex. W at 38-40. Nonetheless, Plaintiff testified that at the end of the settlement conference, he had no idea on what amount the parties had agreed since they had discussed amounts ranging from $9,000 to $53,000. Plaintiff unambiguously disputes Defendant's assertion that, at the end of the settlement conference, the parties agreed "openly" that all of the material terms of the settlement had been agreed to. See Pl.'s Resp. to Def.'s L.R. 56.1 Statement, ¶ 36. Disregarding this testimony in favor of Taylor's testimony and the statement by ALJ Jansen would require determining Plaintiff's credibility—the function of a jury, not judge at the summary judgment phase. See Anderson, 477 U.S. at 255.

Defendant characterizes Plaintiff's testimony as self-serving or, in the very least, evidence of a mere change in heart.  Thus, Defendant urges a ruling similar to that in <u>Pohl v. United Airlines, Inc.</u>, 213 F.3d 336, 340 (7th Cir. 2000): "[The plaintiff's] misplaced belief that he could back out of the settlement at any time prior to signing it does not entitle him to legal relief from a settlement negotiated with actual authority by his attorney."  Defendant also highlights the fact that ALJ Jansen issued a notice stating that "the parties have announced that settlement has been reached."  Def.'s L.R. 56.1 Statement, ¶ 39.  Notwithstanding this fact, Plaintiff's testimony creates a question as to whether the parties reached an agreement as to the settlement amount.    Defendant also argues that Plaintiff's words (or lack thereof) and conduct suggest that Plaintiff did reach an agreement as to the settlement amount: Plaintiff received a copy of Taylor's letter (indicating a settlement had been reached, but Plaintiff did not wish to follow through) but did not object to the contents of the letter, even to Taylor.   The same, however, may be said of Defendant: *Defendant's* conduct suggests that the parties did not reach an agreement at the settlement conference.  Defendant does not dispute that it did not seek enforcement of any oral agreement in the STAA proceeding.  Moreover, after the settlement conference, Defendant sent Plaintiff three different documents captioned "Settlement Agreement."  While Defendant disputes that these documents are indeed additional, proposed settlement agreements, Defendant's conduct in sending these multiple documents suggests that the settlement conference did not yield a fixed agreement that merely needed to be memorialized.

Thus, viewing the facts in the light most favorable to Plaintiff and drawing any

reasonable inferences in his favor, there is genuine issue of fact as to whether Plaintiff breached

a settlement agreement.  Summary judgment on this counterclaim is not appropriate.


**IV.    CONCLUSION**

For the foregoing reasons, Defendant's motion for summary judgment is DENIED.


Enter:


/s/ David H. Coar
David H. Coar
United States District Judge

Dated: **July 31, 2006**